Gibson Auto Company, Inc., Appellant, vs. Finnegan, Attorney General, and others, Respondents.

*December 7, 1934—March 5, 1935.*

For the appellant there was a brief by *Barber, Keefe, Patri & Horwitz* and *Lloyd D. Mitchell,* attorneys, and *W. Mead Stillman* of counsel, all of Oshkosh, and oral argument by *Mr. Frank B. Keefe* and *Mr. Stillman.*

For the respondents there was a brief by the *Attorney General, Joseph G. Hirschberg,* deputy attorney general, *C. G. Mathys* of Madison special counsel, and *Carl B. Rix* of Milwaukee, and oral argument by *Mr. Hirschberg, Mr. Mathys,* and *Mr. Rix.*

ROSENBERRY, C. J.   A proper determination of the questions raised requires us to state at some length the principal provisions of ch. 110, Stats. (emergency promotion of industrial recovery).   It is evidently patterned after the National Industrial Recovery Act, ch. 90, 73d Congress, Sess. 1 (N. I. R. A.), 48 Stat. at L. 195.

Sec. 110.01, after declaring that an emergency exists, provides:

"It is hereby declared to be the policy of the legislature to remove obstacles to business recovery, to promote the organization of industry for the purpose of co-operative action among trade groups, to induce co-operation between em-

ployers and employees, to eliminate unfair competitive practices, to reduce and relieve unemployment, to improve standards of labor and otherwise rehabilitate and conserve the natural resources of the state."

Sec. 110.02 fixes the duration of the act as two years after the date of its enactment.

Sec. 110.03 provides that the governor may delegate any of his functions and powers and may utilize voluntary and uncompensated services.

Sec. 110.04 (1) provides:

"(a) Upon application to the governor by one or more trade or industrial associations or groups, the governor may approve a code or codes of fair competition and trade practices for the conduct of. the intrastate business of the trade or industry or subdivision thereof, if the governor finds (1) that said code has been approved by a preponderant majority of persons engaged in such trade or industry or subdivision thereof, which majority of persons control a preponderant amount of volume of business in dollars and units of output, and pay a preponderant amount of wages paid in such trade or industry or subdivision thereof, (2) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, (3) that such code or codes are not designed to promote monopolies, . . . (4) that such code or codes are not inequitable. . . . The governor may, as a condition of approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees and others. . . .

"(b) Upon the approval of any such code covering any. trade or industry or subdivision thereof, all persons, firms or corporations engaged in such trade or industry or subdivision thereof, shall, as to the intrastate trade or business carried on by them, be bound by such code and any standards adopted and approved by the governor subject only to such exemptions to the application thereof as may be provided in the approved code or imposed by the governor as a condition of the approval of the code."

(2) Codes of fair competition and business practices shall establish standards of maximum hours of labor, minimum rates of pay and working conditions, and shall contain the following conditions: (a) Right of employees to bargain collectively; (b) that no employee shall be required to join any company union or refrain from joining a labor organization of his own choosing.

(3) Provides for the publication of the code.

(4) Any violation of the provisions of the code are deemed an unfair method of competition and penalized as prescribed in sec. 99.29.

(5) The circuit courts of the state are vested with jurisdiction to prevent violation of any code of fair competition and business practices.

Sec. 110.05 provides for modification of any code by the governor.

Sec. 110:06 makes provision for reports, right of examination of books, etc.

Sec. 110.07 provides an exemption from the antitrust laws corresponding to the exemption of trade or industry from the antitrust laws of the United States.

Sec. 110.08 "The costs of administration of chapter 110 shall be defrayed as follows:

"(1) Those charges incurred by the governor in connection with the initiation and supervision of codes and agreements shall be assessed as far as possible to the trade or industrial association or group to whom the code or agreement in question applies, and

"(2) Those charges not directly assessable under (1) shall be defrayed from a fund to be built up by adding to the direct charges assessed a percentage thereof sufficient to defray charges not assessable; provided, that the additional assessment for such charges shall not exceed twenty-five per cent of the direct charges."

Sec. 110.09 provides for the method of co-operating with the federal government.

Pursuant to the authority conferred by this chapter, the motor vehicle retailing trade proposed a code. Art. I thereof relates to declaration of policy. Art. II defines the terms used in the code. Art. III relates to employment regulations insuring the right of labor to organize and bargain collectively, governing the age of employees, the wages, and hours, classifying areas and prescribing the wages within areas, fixing a minimum wage, in all twelve separate paragraphs.

Art. IV relates to trade regulations, including, (a) used car allowance, (b) marketing rules, and (c) trade practice rules.

Art. V creates a state executive committee, empowers the committee to propose changes in the code; also to require reports from county associations or local associations or from individual dealers, to inquire into the operation of the code, and make rules and regulations necessary for financing the administration of the enforcement of the code.

Art. VI relates to statistics.

Art. VII relates to the manner in which the code itself shall be interpreted, and for various extensions of the code provisions.

In entering upon a consideration of the questions raised upon this appeal, we may appropriately repeat, what has been said many times before, that under our system of government the court is not called upon to consider the economic, social, and political matters dealt with in the act. Whatever conclusion may be reached as the result of our deliberation, it in no way involves the determination by the court of the social value of the objectives sought. Under our constitutional system, in reviewing an act of the legislature, the duties of the court are limited to considering whether or not the act of the legislature contravenes the provisions of the constitution. The duty of the court to do this arises from the fact that the constitution is the supreme law of the state. If the legislature passes an act which is in contravention of the constitution, and a citizen asserts a right under the con-

stitution denied him by the act of the legislature, of necessity the court must determine which controls,—the constitution or the act of the legislature. It cannot determine the rights of parties otherwise. From the beginning the provisions of the constitution have been held to be supreme and therefore controlling.

It is contended that the act is an unlawful delegation of the power to make and declare laws vested by the constitution in our legislature. (Art. IV, sec. 1. The legislative power shall be vested in a senate and assembly.) The act under consideration has one distinctive feature which this court has so far never been called upon to consider. No provision of the act can by its terms become effective until some trade or industrial association or group applies to the governor for his approval of a code. After a proposal has once been submitted, the power of the governor to modify, amend, or terminate it is aroused; he has no power whatever to initiate a code. His authority is dependent upon his finding: (1) That the code has been approved by a preponderant majority of the persons engaged in the trade or industry as defined in the act; (2) that no inequitable restrictions are imposed; (3) that the code is not designed to promote monopolies, etc., and (4) that the code is not inequitable as regards the interest of consumers.

It is true that the code would have no vitality or legal effect if not approved by the governor. However, the question of whether or not there shall be a code, which is nothing more nor less than a law relating to a particular industry, is wholly dependent upon the initial determination of the members of an industry. It is conceivable at least that a code might be proposed under the terms of the act by persons not citizens of the United States, which would, when approved by the governor, become the law of the land.

It is difficult to conceive of a more complete abdication of legislative power than is involved in this act. Not only is the power to determine whether or not there shall be a

law at all delegated to an indefinite class or group, but the governor and all other public officers are rendered powerless to act except upon the initiative of a preponderant majority of a group. It must be borne in mind that the power delegated is not the power to organize and adopt self-governing ordinances. The power delegated is the power to frame and adopt a code which, when approved, becomes a law with penal sanctions.

In *State ex rel. Wisconsin Inspection Bureau v. Whitman,* 196 Wis. 472, 220 N. W. 929, this court gave extended consideration to the matter of the delegation of legislative power. There is no reason why we should repeat here what was said there. That case as nearly as is possible charts the limitations to be observed in making a valid delegation of legislative power. It is said:

"The power to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate,—is a power which is vested by our constitutions in the legislature and may not be delegated. When, however, the legislature has laid down these fundamentals of a law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose. . . ."

The act under consideration here attempts to do precisely what it was said in *State ex rel. Wisconsin Inspection Bureau v. Whitman, supra,* the legislature may not constitutionally do; that is, delegate the power to declare whether or not there shall be a law. Under this statute, that declaration is left to the preponderant majority of the trade. The act does not even declare unfair competitive practices illegal. While the purpose of the act seems to be the relief of unemployment and industry, yet no industry is required to produce a code. If the regulation of any trade or industry so minutely as is provided for by the code of fair competition

of the motor vehicle retailing trade is in the public interest, the act nowhere so declares nor can it be said to be implied. What is in the public interest is to be found by the preponderant majority of the trade. The code as adopted and approved deals with matters of the highest public concern; co-operation between employees and employers; the elimination of unfair competitive practices; the reduction and relief of unemployment; the improvement of standards of labor, removal of obstacles to business recovery; the rehabilitation and conservation of the natural resources of the state. These matters of the very highest importance to the general welfare are by ch. 110 to be dealt with, not by the legislature in whom the power to make laws is vested by the constitution, but by an indefinite, unascertained, self-perpetuating group which may be in existence or may thereafter come into existence.

The grounds upon which our determination rests may be more clearly disclosed by contrasting the provisions of ch. 110 with some of the provisions of ch. 101, relating to the regulation of industry. Sec. 101.06 provides:

"Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. . . ."

Upon the industrial commission is conferred the power, jurisdiction, and authority (sec. 101.10 (3) ),—

"To investigate, ascertain, declare and prescribe what safety devices, safeguards or other means or methods of protection are best adapted to render the employees of every employment and place of employment and frequenters of every place of employment safe, and to protect their welfare as required by law or lawful orders. . . ."

We have quoted enough from the act for purposes of illustration. By the terms of the act the legislature itself charged every employer with a duty, to wit: The duty of furnishing a safe employment and a safe place of employment for employees and frequenters. To the industrial commission is committed the power and authority to make such rules, orders, and regulations as are necessary to give effect to the declared legislative will. By that act the legislature did not give to the industrial commission or any other subordinate person, body, or group, the option to say whether in any particular line of industry there shall be a safe place of employment. That the legislature said for itself. The objects to be attained are declared to be the protection of the life, health, safety, and welfare of the employees and frequenters. A definite objective is prescribed in the achievement of which the industrial commission is to aid by the filling in of details. Compare this legislation with the provisions of ch. 110. Ch. 110 requires no group or body to do anything. It prescribes no duty. When a preponderant majority as defined in the act of a group thinks the declared purpose of the act will be better achieved if that particular trade or group has a code, they may propose one to the governor. While it is true that by ch. 110 certain things are to be provided for in a proposed code (sec. 110.04 (2) ), nevertheless the means of achieving the desired end is left to the preponderant majority. The only difference discoverable between the authority vested in the trade group with reference to the provisions of the code and the power vested in the legislature itself by the constitution is that the group may not put the code into effect over the veto of the governor.

As has been already remarked, ch. 110 is apparently patterned after the provisions of the National Industrial Recovery Act. There is, however, one fundamental difference. By sec. 3 (d) of N. I. R. A. the President upon his own

motion or upon complaint may after public notice and hearing prescribe and approve a code of fair competition for any particular trade or industry. While the use of this power is apparently permissive, it nevertheless confers a potential authority upon the President to achieve the declared purposes of the act by executive order, and he is not obliged to await the submission of a proposed code before his authority springs into existence. It is to be regretted that up to the present time there has been no definitive opinion by the supreme court of the United States upon the validity of the power thus sought to be delegated to the President. It is considered, however, that the two acts are so fundamentally different with regard to delegation of legislative power in the respect pointed out and in some other respects, that, while a determination by the supreme court of the United States would be helpful, it would not necessarily control the decision in this case, because of the wide divergence in the nature of the two acts.

One case, however, has been considered and determined by the supreme court of the United States which throws some light upon the question. By sec. 9, N. I. R. A., the congress sought to regulate interstate transportation of oil. By sec. 9 (c) it is provided:

"The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State."

After pointing out that no provision of the National Industrial Recovery Act operates to limit the power thus delegated to the President (and in that respect Mr. Justice CARDOZO dissents from the determination of the majority), and reviewing the cases where the supreme court of the United

States considered the matter of delegation of legislative power, the court said:

"If sec. 9 (c) were held valid, it would be idle to pretend that anything would be left of limitations upon the power of the Congress to delegate its law-making function. The reasoning of the many decisions we have reviewed would be made vacuous and their distinctions nugatory. Instead of performing its law-making function, the Congress could at will and as to such subjects as it chose transfer that function to the President or other officer or to an administrative body. The question is not of the intrinsic importance of the particular statute before us, but of the constitutional processes of legislation which are an essential part of our system of government." *Panama Refining Co. v. Ryan,* 293 U. S. 388, 55 Sup. Ct. 241, 253, 79 L. Ed. (Adv. Ops.) 223.

Whether or not the power conferred upon the President to approve or prescribe codes which must conform to certain standards prescribed in the act, is a valid delegation of a legislative power can be determined authoritatively only by the supreme court of the United States.

We are not called upon in this case to deal with a narrow question of the delegation of the legislative power to fill up the details or to make public regulation interpreting the statute and directing the details of its execution. That the legislature acting within constitutional limitations may do, but it may not in effect abdicate its legislative functions. An act which attempts to do that is invalid in fact though valid in form. *State ex rel. Mueller v. Thompson,* 149 Wis. 488, 137 N. W. 20. Applying the principles laid down in *Panama Refining Co. v. Ryan, supra,* as well as those declared in the prior decisions of this court, ch. 110 is invalid for the reason that it is an unlawful attempt to delegate the lawmaking power vested in the senate and assembly by sec. 1 of art. IV of the constitution.

We are not unaware of the large considerations of public policy which prompted the enactment of ch. 110. We are obliged to reach the conclusion, which we do reluctantly, and

in full recognition of the rule that no statute should be declared unconstitutional except upon the clearest and plainest grounds and when no other reasonable conclusion can be reached. There are many matters urged upon our consideration in briefs of counsel which raise questions of the first rank, and which we do not consider for the reason that the same questions may not arise under a law enacted with due regard to the fundamentals of our constitutional system. Nor shall we attempt to say in àdvance what our conclusion would be if ch. 110 more nearly conformed to the provisions of the National Industrial Recovery Act. That question can properly be determined only when it arises.

This court has had occasion in a number of cases to consider the matter of delegation of legislative power. These cases are dealt with in *State ex rel. Wisconsin Inspection Bureau v. Whitman, supra,* and declare the law quite plainly.[1] In addition to that as already stated in the opinion of the court in *Panama Refining Co. v. Ryan, supra,* the federal cases dealing with the same subject are reviewed at length.

The provisions of ch. 110 attempting to delegate the power of the legislature to determine whether or not there shall be a code to a preponderant majority of an unascertained group being void, the whole act necessarily fails, for the reason that the essential basic features of the act being void, the whole act is void. *State ex rel. Reynolds v. Sande,* 205 Wis. 495, 238 N. W. 504.

*By the Court.*—Judgment appealed from is reversed, and the cause remanded for further proceedings according to law.

MARTIN, J., took no part.

---

[1] See foot-note, 196 Wis. 502, 220 N. W. 940. See also note, Constitutional Law, etc., 29 Ill. Law. Rev. 809, for helpful analysis; also "Unguided Administrative Discretion," 14 St. Louis Law Rev. 261; "The National Industrial Recovery Act and Delegation of Legislative Power to the President," 19 Cornell Law Quarterly, 389; "The Delegation of Federal Legislative Power to Executive Officials," 33 Mich. Law Rev. 512 (February, 1935).